Mr. Gower. Good morning. Good morning, Your Honors. My name is Ed Gower. I represent Dunnett Bay Construction in this matter. I will be addressing standing, but given that it is a threshold issue, but given that it turns in part on the facts, I'll go ahead and address the summary judgment issues, material facts in dispute first. Don't you want to address standing first? I will if you would prefer that I do, but I think standing is pretty clear and I have quite a bit to get through in the way of facts. I'll do it either way you'd like, Your Honor. Just do it the way you want to do it. Fair enough. This case arises out of a special vetting for the Eisenhower Expressway project on January 15, 2010, conducted by the Illinois Department of Transportation. My client, Dunnett Bay, was the low bidder for one of the projects on that vetting at a value of about $10.5 million. Dunnett Bay's bid was rejected because Dunnett Bay didn't meet the DBE goal of 22 percent for the project and the department concluded that Dunnett Bay failed to meet the DBE good faith efforts requirement. Maybe you can answer this question right off the bat for me. Whatever problems there were with the first round of bidding, why weren't they mooted by IDOT's decision to re-let the bid? First and foremost, my client probably spent three weeks putting together its bid, assembling its DBE provisions, bidding the contract. Its proposal would have been accepted but for unconstitutional limitations imposed by IDOT. The contract was rejected on the grounds that it was non-responsive, but for that, Dunnett Bay would have been awarded a $10.5 million contract. How do we know that Dunnett Bay would have won the contract in round one? I mean, even though it had the low bid, it was still above the program price and more importantly, I guess, its DBE participation was far below the goal of 20 percent and we know that this was due in large part to its omission from the list of bidders. So why should we assume that even in the absence of the quota approach that you've alleged that IDOT necessarily would have awarded the contract to Dunnett Bay? That's a very good factual question, Your Honor. The short answer from our perspective is that Dunnett Bay's contract was not rejected by Secretary Hannig because it was above the goal. Secretary Hannig sent a short letter to Dunnett Bay on or about February 2nd in which he told Dunnett Bay that its bid was rejected because it was non-responsive. Program estimates have nothing to do with non-responsiveness. The sole reason that the bid was rejected was because they failed to meet the DBE goal. And this after the fact rationalization ought not confuse the court. So you emphasize that you submitted the lowest initial bid. So is it your position that once IDOT puts out a contracted bid, it must always award the contract? No, it's not my position. What if IDOT forgets to include something and realizes afterwards, after the bids are in? There's a process that IDOT goes through in terms of comparing the bid to making sure that there were no busts in the plans that affected the bid. So you agree IDOT can pull something back? I do. Revise and then have a re-bid? I do agree with that. But I'm troubled that I had the same question as Judge Rovner, my sister Judge Rovner. Even if IDOT found you acted in good faith and you met the DBE goal, there's no guarantee Dunnett Bay would have gotten a contract. The contract was within the awardable estimate. There's no evidence of any busts in the plans. And the district engineer for that region who was responsible for the Eisenhower project recommended the award of the Dunnett Bay project, excuse me, bid. Furthermore, there is evidence in the record that Gary Hanig, Secretary Hanig, sent an email to Judge Rovner's office asking for guidance. And in that email he said, under ordinary circumstances, Dunnett Bay was the low bidder and would be awarded this contract. But beyond that, there also is prospective relief with respect to the unconstitutional operation of the DBE program and its impact on this and future contracts. If you answer Judge Rovner's question about mootness, I missed it, could you go over that again, why this is not mooted out by the second bidding process? Because my client had a contract in which it met all the contract requirements, was the low bidder, the Secretary of Transportation sent an email saying that under ordinary circumstances that Dunnett Bay would be awarded the contract. The regional engineer recommended award of the contract, and IDOT rejected Dunnett Bay's bid solely based upon the failure to meet the DBE program. There wasn't any discussion of program estimates at the time, and they went ahead and re-bid it after they rejected my client's bid on unconstitutional grounds. I don't believe that moots the prior conduct. But your bid was above the program estimate, correct? Yeah, but the program estimate, there are two estimates that they look at. One is the engineer's estimate, which is an analysis of how close the bid was to the engineer's estimate, the detailed estimate of the cost. This bid was under the engineer's estimate. There also is a program estimate. It was a million over the program contractor's. There's also, I'm talking right now about the engineer's estimate. The program estimate is an estimate that is put together as part of the annual program. In order to assert some discipline with respect to the districts and what they program, and to avoid them having low program costs and then having a bigger program because they haven't programmed correctly, the central office requires the district to decide where there's a program estimate, whether they're going to make up that difference by eliminating another project. And in this case, the head of that office, the regional engineer, Diane O'Keefe, recommended award of this contract. She was going to have to make it up elsewhere. But that doesn't mean that the project, that the project is going to fail. There's also a request pending for prospective relief and injunctive relief to correct the defects in the program. Can you speak to the waiver issue and the waiver policy? Because my understanding from the record is 60% of the waivers, 60% of the requests for waivers were granted in 2010. And that seems to indicate to me that IDOT didn't have a no waiver policy. After the fact, after Secretary Hannig said that there would be no waivers issued at the On March 5th, after this lawsuit was filed, IDOT finally issued one waiver and thereafter maybe they cleaned up their program. I will tell you this though, given the approach to the no waiver policy, if you look at the numbers in terms of the number of waiver requests that came in in 2009 and then 2010, and if you look at the record indicating that the American Reinvestment and Recovery Act money had come in and IDOT had a much larger program in 2010, you will see that there were 35 waiver requests made after the January 15th flooding. And 21 of those were granted. In prior years those numbers were much higher. But weren't there legitimate grounds on which to find that Dunnett Bay had not made sufficient good faith efforts to merit a waiver, particularly given that it didn't perform seven of the eight suggested steps? You know what, the rules are written in terms of a reasonableness. And the hearing officer in this case first indicated that he was concerned that other bidders met the bid requirement, which... Right, and the others reached the 22% goal, and you were under 9%. So why can't the hearing officer take into account what other bidders have been able to do? So if the other bidders were four or five of the points they weren't able to achieve, or it turned out they could only make an 11%, the reasonableness changes based on the circumstances, doesn't it? It does. There are two things. There are several different things. There are a number of things that the hearing examiner or hearing officer can take into account. One of those is whether the other bidders met the goal or not. Another thing that they can take into account is whether the bidder that didn't meet the goal has previously met the goal. And in this case, Dunnett Bay used the same system, same process, the same one week involving three people working to get their DBE numbers put together, and in this one bid, it didn't work. On eight of the other nine projects on that letting, it did work. In this case, in the case of the Eisenhower Expressway project, it didn't work. Dunnett Bay wasn't on the four bid bidders list. The director of highways testified that the four bid bidders list is there for the purpose of telling DBEs to whom they can submit their bid. This was a letting in which the system had changed. Prior to 2010, the submission of the DBE utilization plan wasn't required to be made until seven days after the letting. That meant that the DBEs only needed to submit a bid to the successful bidder. That changed with the January 15th letting. As of January 15th, 2010, DBEs were required to submit bids to anybody that they thought was bidding. In the case of Dunnett Bay, they didn't think Dunnett Bay was bidding. The day of the letting, after the awards were announced, Dunnett Bay got bids from DBE subcontractors that would have enabled Dunnett Bay to meet 22.43% of the goal. Furthermore, I understand your honors concern, the Deputy Director of the Office of Business, Workforce, and Diversity, who attended the reconsideration hearing, who had administered the DBE program for 30 years at a staff level, and then at a Bureau Chief level, and then at a Deputy Director level, and who had administered the modification program prior to the first year, recommended that Dunnett Bay be given its waiver. This case is here on a factual issue. The question is were there sufficient material facts in dispute to warrant proceeding to trial? Would it have been permissible for IDOT to say, look, we've been too quick to grant waivers in the past, so we're going to start taking a much more critical look at the good faith efforts a bidder has made before granting these waivers in the future? Within limits. Well, could you elucidate? The, if you look at the Croson case, you will see that in Croson, the City of Richmond also had a good faith effort provision, but that good faith effort provision was only for exceptional indicators showed that they had utilized all feasible alternatives. That's not the case, that wasn't the case here. I agree, and if you look at, if you look at the language in Appendix A of 49 CFR Part 26, you will see that it's framed in terms of reasonableness. What was reasonable to do under the circumstances? It doesn't require that you do everything, and when you talk about the various factors, I mean, the other factor other than not meeting the goal that Mr. Grunlow told us after the fact, when he did, of course, he didn't write anything down, but he told, which violated the rules, but when he told us after the fact what the basis for his decision was, he told us that it was because they didn't contact supportive services contractor, and they didn't contract, contact the Office of Small Business Enterprises. Dunnett Bay tested, the supportive services contractor, they have, I showed him the language from the IDOT website, I showed, I asked him about what he knew about what the supportive services contractors do. They're not there to help with meeting goals. They're contracted to assist the DBEs with financial, accounting, and other work type issues. Dunnett Bay, Mr. Ferber testified for Dunnett Bay that he had contacted supportive services in the past, and that there had been absolutely no help. He also testified that he had previously contacted the Small Business, Bureau of Small Business Enterprises in the past, and gotten no help. So, he's not required to do meaningless things. He's using a system that has routinely worked every time in the past. He's never had a bid rejected before, and in this particular circumstance, there were a combination of several different factors, not being on the forbid bidders list, and a wholesale, I believe, violation of the DBE rules by the Department of to support submitting that case to a jury. I'm not sure where I am with respect to time. Don't worry. Lady Bountiful is here. All right. Would you like to hear my argument, or you want me to skip to standing? If you have any other questions, I'm willing to answer anything you have. I want to talk a little bit about Northern Contracting, simply to make sure that this panel understands this is not Northern Contracting 2. There is no facial attack on the validity of the DBE rules. This, we contend, is, at least insofar as the DBE program is concerned, was a rogue agency that was operating outside the limitations of the existing federal rules. Every action that is the subject of attack in this case involves allegations that IDOT violated the DBE rules, and there's ample evidence in the record to support the existence of those violations, and I'll be glad to walk through them if you'd like. No, no. No, all right. Thank you. All right. Let me talk about standing then, since you were concerned about it to begin with. I'll tell you what does really concern me. In, on the question of standing in the briefing below, Dunn and Bey devoted only a single sentence to that issue, and so there's an, there may be an argument that it, that it waived the arguments that it's now making. Well, that might be tied to the fact that the law is crystal clear that we have standing. Say it again. I said that might be tied to the fact that it is crystal clear under the Supreme Court precedent that Dunn and Bey has standing in this case. Okay. That's it. Let's go, kids. No, I will, I mean, I'll keep, I'll explain why I said that. If you look, every, all of the arguments in this case made by the state tie back to the Supreme Court. If you look at that decision, the Supreme Court, there isn't anything in the 14th Amendment that says you're entitled to equal protection of the laws, but in a bidding context, you can only bring an equal protection claim if the other bidders weren't subjected to a similar unconstitutional condition. If you look back at the Northeast Florida, Northeastern Florida case, you will see, cited with approval, the Bakke decision. And in Bakke, there were, the challenge was made to the admissions for medical school, whereby the, excuse me, the admissions office reserved 16 admission spots for minorities. The other 84 were open. The challenge made by the twice-rejected medical applicant was to the reservation and the inability to compete for those other 16 spots, even though everybody else was subject to the same condition, that is, those spots were reserved for all the other applicants as well. This is the same type of situation. Bakke was granted standing by the Supreme Court. Next, the Northeast Florida case cites the Croson. It involved a challenge to the city of Richmond's contracting program where they reserved 30 percent, you had to subcontract 30 percent of all highway construction contracts to minorities. Croson and Judge O'Connor's plurality decision in that case was cited with approval with respect to the standing of Croson to challenge the city of Richmond case. City of Richmond set aside. I submit to you the only difference between the Croson case and the case that we brought here is that the city of Richmond was up front that they were running a quota program and IDA hasn't been. I see I'm out of time. So I will give you some rebuttal time, but I think we have to stop. Is there one last thing you want to say? Well, the other point I would make simply is that the Builders Association case that this course decided with respect to the Cook County minority program was on all fours with this. It also was a subcontracting program. The practical fact is that they couldn't compete for the other 22 percent on this project the same way that Croson and the Builders Association cases were complaining about. Thank you. Thank you. You don't have to take it, but I'm going to have to, out of fairness, give you five extra minutes. If you want it, you know you can take it. I appreciate that, Your Honor. I don't know that I'll need it. You'll break our hearts, but you can take it. It's good to know that it's there if I need it. Good morning, Your Honors. This is Mary Welsh. I'm here on behalf of the Illinois Department of Transportation and its Secretary. The questions this case presents is whether plaintiff has standing, and if so, whether, in fact, the plaintiff presented enough evidence to show a 14th Amendment violation. With respect to standing, what do we make of the evidence suggesting that in the past, waivers were routinely granted? Does that make it more reasonable to suppose that Dunabay would have gotten a waiver in the first round of bidding for this contract, but for the alleged no waiver policy? Well, Your Honor, I mean, it just doesn't make sense to say there's a no waiver policy when, in fact, there were waivers. Both in 2009, there were, what is it, 32 out of 58 requests were granted, and the other people cured. Remember that as of January 1, 2010, the process changed, and so the contractors, general contractors, had to submit with their bids all of their documentation of their good faith efforts. They could not cure their deficiency after the bid. So in 2009 and earlier, everybody who wasn't granted a modification had cured after the bidding process, and that curing possibility no longer existed in 2010. So that would also explain the numbers, but in addition, what the numbers tell you is that there were fewer requests. There were 35 requests, and what that tells you, among other things, is that the goals were reasonable. Even Plaintiff testified that he believed, Plaintiff's President testified that he believed the 22 percent goal here was reasonable. But to go back to standing as a general matter, first of all, as the Court mentioned, Plaintiff forfeited the entire standing issue by not saying anything about credential standing in the District Court and saying in one sentence, we're just like Adirond. That was Plaintiff's entire standing argument in the District Court, and if that's not forfeiture, frankly, I don't know what is forfeiture. But if the Court decides that it should and will address the standing question, what Plaintiff had to show was that it was, at this point, had to present evidence that it suffered an injury fairly traceable to the, you know, to unconstitutional conduct. And ultimately, as the District Court found, he also had to show that it would have been awarded the contract, but for the unconstitutional conduct. And as Mr. Gower just said, there was a combination of factors that led to his not, you know, his clients not getting the contract. There was, and most important, and even Plaintiff's President said this at the reconsideration hearing, I wasn't on the no-bid list, or the for-bid list, rather, and that's why I didn't meet the goal. Not being on the for-bid list was a significant causation element here, and in fact, although, in fact, Mr. Hoenig told Plaintiff's President later, we want to, after the reconsideration hearing, we want to be fair. We know you weren't on the no-bid list. We feel that it tainted the bidding process, and that's why we're going to re-let the bidding. Speaking about Mr. Hoenig, what about the fact that he told Mr. Furby that he was under pressure not to grant waivers? Doesn't that support an inference, at the very least, that there was a waiver policy? Well, Your Honor, actually, to me, that supports the opposite conclusion. If there were a no-waiver policy, Mr. Harris wouldn't have to be calling up Secretary Hoenig and saying, we want you just to have a no-waiver policy. In addition, the newspaper article the Plaintiff relies on has the same negative inference, because in that newspaper article, which, you know, is hearsay, but nevertheless, you know, Mr. Harris is quoted as saying, we're trying to encourage the policy. If there is a no-waiver policy, you don't have to encourage the Department to have it. It's already there. And another piece of evidence that the Plaintiff relies on is the, Mr. Harris talks in a report, the December 14th report, about having a conversation with the Women Contractors Association, and their offer to drop their opposition to split goals. You know, you can't split minority and women participation goals in a contract. You can't have like 10% for women and 10% for minorities. You have to have a 20% goal for either, you know, for both, rather. And so the women's contractors said, we'll drop, reportedly, again, that's hearsay, reportedly said, we'll drop our opposition if you, if the Department institutes a no-waiver policy. Well, why would you make that decision? It doesn't make sense. None of, all of that evidence, really, the only reasonable inference from that evidence, from all these things, these three things I've just mentioned, is that there wasn't a no-waiver policy. Because if there was, people wouldn't be asking for it. Yeah, but what about, no, I just wanted to be clear in terms of the numbers, because it sounds to me that in 09, it was more than 50%, more than 50% of the no-waivers were granted. Correct, correct. And so the impact of the letter that council talks about that was sent in January, in terms of the percentages, you had the same percentage in 2010. I didn't do the math. It's 32 out of 58, and in 09, and it's 21 out of 35. So the math is about the same, I believe. Yes. Go ahead, sorry. Yes. Well, yeah, I just, I was wondering about, you know, Donna Bey's point that one or more of the 2010 waivers were granted after it filed this suit. Does that, would that, or should that, I guess, cast a somewhat suspicious light on these waivers? Well, I don't think so, because remember, the first bidding in this issue, and the waiver process, you know, the first, you know, in the reconsideration process, it just didn't come up. We don't know. As far as I know, that was, you know, plaintiffs had the very first waiver of 2010, and there were subsequent waivers in 2010 as well. But remember that, you know, according to plaintiff, and actually, you know, Secretary Hoenig is, you know, said from the moment he arrived in February of 09, you know, I'm not interested in waivers. I don't want to see waivers. I don't want to have to choose between waivers and meeting goals and setting low goals. I don't want to do that. And so, and nevertheless, even though he said this, again, you know, there were, what, 32 out of 58 waiver modification requests were granted in 2009. So there wasn't, I mean, the numbers tell you that regardless of what people were saying, and again, people were saying, we want you to have no waiver policy. I have a question for the trier of fact, though. If he makes that statement, doesn't that raise the question as to whether, in fact, in looking at individual waivers, there was a no waiver policy? I don't think so, because remember also, Secretary Hoenig had to sign off on every waiver modification. So even though he was saying, you know, he was saying, I don't want to see them, he was granting them. So he can't have been granting them and saying no waivers at the same, and meaning no waivers at the same time. I don't think it's reasonable. It's unreasonable to infer from the 60 percent. When dealing with, don't pay attention to what I say. Just follow what I do. Well, I think, you know, as every parent who has told their child, if you don't clean your room, I'm going to kill you, you know, we say things we don't necessarily mean to underscore our point. Wait a minute, wait a minute. You know, I mean, people. No more ice cream, I can understand. Well, you know, if it's been a week or two, Your Honor, people get desperate. How many children do you have? So, but in any event, you know, the plaintiff just hasn't been able to show that it, you know, did or will suffer an injury that is traceable to the program. Again, I mean, the first problem with plaintiff's theory is that, you know, he, it can't qualify as an enterprise because it's too big. You know, if the enterprise program had no racial component, it still couldn't, you know, benefit from the program. And again, because it's too big, its receipts are too big. So it couldn't, it's not socially or economically disadvantaged. But in addition, the, you know, this program, you know, plaintiff argued that it's just like Croson, it's just like, you know, Bakke. Well, this is patently untrue because those are set-aside programs. There are, you know, the, when a, someone is unable to compete because of a set-aside, compete equally, because there's an incentive. You know, for example, in one case, you got a 5% bonus as a primary if you had more, you know, if you used minority or women subs. In another case, you got extra points. You know, they do this in schools a lot. You get, you know, Fisher, so in these cases, you get 20 points if you're a minority or a woman. You know, and so that gives you a leg up. Plaintiff, plaintiff, no, there's nobody who had a leg up on plaintiff here. There is nobody who had a leg up on plaintiff here. Let me ask you this, hypothetically, if it were clear that Dunnett Bay lost the bid only for failure to meet the DBE goal, would you agree that it would have standing to argue that the goal was improperly inflated? If it presented evidence that this was the but-for causation? Yes, yes. So would it, if they lost a $10 million contract on that basis alone, would that be a concrete injury caused by the alleged improper goal? Well, again, I don't think, again, because you couldn't say that it suffered discrimination because of race. Even if it lost it, even if there were no, even if it had been on the bid list, for example, even if there weren't all these other factors that Mr. Gower mentioned, the problem is that because plaintiff, even if plaintiffs were owned 51% by a woman or a minority, it still would be in the same boat. It still would have missed, it still would have been rejected because its efforts were so meager. And again, you know, plaintiff, at the hearing, you know, plaintiff admitted that it hadn't done, it hadn't used the department's directory, which is updated every month. Instead, it had used its own directory, which was something like 40% out of date. You know, I mean, and that's why it got so many poor responses, or so many non-responses in its inquiries, solicitation for subcontractors. You know, plaintiff did remember that the, you know, plaintiff miscited the rules because in the appendix, the 49, you know, Section 49, Appendix A, it says that this means that the bidder must show it took all necessary and reasonable steps to achieve the goal. Now, and that's in, you know, Paragraph 1. So, in fact, you have to make a serious effort. And plaintiff, as the court noted, plaintiff didn't do seven of the eight things that are listed, seven of the eight non-exclusive factors. And so, and again, I mean, we felt, the department felt that it was because he, the plaintiff was left off the bidder's list, that this really was to the department, the but-for causation of the problem, I believe. And because this seemed so unfair, because it was so far below, and it was the only, below the goal, and it was the only one left off the bidder's list, and everybody who was on the bidder's list met the goal, that the fair thing to do was to re-let it. And because it was re-let, it wasn't awarded, you know, this is another difference from all the other cases. This contract wasn't let to the second lowest bidder. It was not let at all. It was re, it was not awarded at all until the second re-letting. So really, it's unclear, you know, plaintiff's saying, I would have been awarded the contract, but for the program, I mean, that's not true, because it wasn't on the bidder's list, and, as the court noted earlier, it was 16% over the program estimate. And when it was re-bid, it's quite interesting to note, although it was slightly, the scope of the contract was slightly altered, you know, plaintiff's bid was almost $350,000 less, and it wasn't even the lowest bidder then. Is it your view that no good deed goes unpunished? Is that your view? Well, that seems to be plaintiff's view, you know, that we should be punished for trying to do the right thing here, by re-letting the contract. You know, at page 20 of the blue brief, Dunn and Bay listed a number of other procedural changes that IDOT made in 2010. For example, rejecting bids that didn't meet DBE goals without first considering good faith efforts, that the U.S. Department of Transportation ultimately disapproved. Do those changes take us out of the Northern Contracting Framework? Well, first, there are a couple of predicates to the answer to that question. First of all, this doesn't take into account that Illinois law had changed. And so this was the change I was talking about earlier, that now bidders had to submit with their bid, all of their information about their good faith efforts. They could not, and could not cure post-bidding. So that's one thing. And so what happened was, because this was the first letting under this new law, there was some uncertainty about how to enforce it. And so what the department decided to do with advice from its counsel was to say, look, if there's a facial, every bid that doesn't facially either meet the goal, that doesn't facially meet the goal, or doesn't ask for modification, we're just going to facially reject them and give them the opportunity for the hearing. And the feds approved the new statute. So I'm not really sure why plaintiff is saying that the feds didn't approve this. And in fact, the letter that they cite for this proposition, which I have here, in fact, was in August. It's document 164-1 is where one copy is. And it's a letter in August about a completely different subject matter. It's about rejecting all bids, all bids in a case. And also about whether the opportunity should be afforded for reconsideration hearing. And that's what happened here. Plaintiff was, I mean, I have to say this is one of the first times I've heard a plaintiff objecting to the fact that it was offered a hearing. It's unusual to us. And so it had the opportunity. It submitted a hundred, at least a hundred more pages of documentation, which technically it wasn't allowed to do. All of its documentation should have been with its bid. But it wanted to show that it could have met the bid with, it could have met the goal with the quotes that it received after the letting. And this is yet another indication that the reasonable inference is that the but-for cause is that they were left off the bid list. Because once it was known that they were bidding, and in fact, that they were the lowest bidder, they got enough bids to meet the goal. So, but to go back to your question about northern contracting. So, again, the idea of the 14th Amendment is that you have to show that you were injured by, because of your race. And the way to do, and racial classifications such as the, and actually it's not racial because you could be a white male and be a DBE enterprise. But you have to show, you have to pass strict scrutiny for a classification that takes race into account. Now in northern contracting, this court made very clear that the compelling interest of the federal government in enacting the federal program, federal funding program, is, can be relied on by the states for the necessary compelling government interest. In addition, northern contracting held that the, that states are insulated from a narrow tailoring challenge as long as they comply, as long as they had federal authority to do what they did. And here, the department had federal authority to do what they did. In fact, the department had to send the goals, the new goals, the 22% goal for this contract to the feds to get it approved. And the feds approved it. So it's, and also the record shows that there was a two-level revision of the goal from the 8% to the 22% in that they expanded, they looked at the old goals, which were 8%, and which, you know, historically, Illinois was not meeting its statewide goal. The statewide goal was 20%, and Illinois was 22%, rather, and Illinois was only achieving 11%, half of the statewide goal. In fact, you know, perhaps it was even at risk of, you know, being accused of not making good faith efforts. And that's why when Secretary Haney came in, it's not surprising that he said, you know, we're going to do it right now. We're going to have higher goals, and we're going to have, you know, and we're going to meet them. We're going to have enterprise participation, because that's where the federal money is coming from. And so, again, with regard to the goal setting, if the federal government approved it, I'm not really sure how a plaintiff can say that we violated, the department violated federal law in setting the new goals. In addition, the no-waiver policy, we've discussed that at length. There can't be a no-waiver policy if you grant waivers. It's just not factually possible. If you granted waivers in 2009, and you granted waivers in 2010, you can't, the notion that there is a policy against waivers is simply unreasonable. No reasonable jury could have found that. And lastly, with regard to the good faith rejection, plaintiff, you know, plaintiff again said that the goal was reasonable. Plaintiff admitted that it hadn't taken seven of the eight steps, or seven of the eight possible methods that it could have to achieve the goal. And plaintiff also, at the hearing itself, you know, stressed that if it had been on the bid list, it would have made the goal. So I don't know how plaintiff can say that the rejection of the, how any jury could find that the rejection of the list here, of the plaintiff's bid here, was for not meeting the goal and for not making sufficient good faith efforts, was in fact discrimination as, you know, because of race. If the court has no more questions, we would ask that the court affirm either on standing grounds the judgment in favor of defendants, or that it affirm on the merits, because the department was entitled to summary judgment. Thank you. Thanks, Ms. Walsh. Oh, three minutes. Three minutes? Yeah. Thought this. No. I started by telling you that this was a rogue agency, but I'm going to address first the standing question that you asked, Judge Williams, and you asked exactly the right question, which is if there was a, if this truly was, in effect, a business reserved for minorities and female, isn't it identical to what happened in Croson? Isn't it identical to what happened in Bakke? And the short answer is yes. Dunip Bay wasn't eligible to do that work because of the color of its skin, of the owner's skin, or their sex. To return for a moment to the theme that I started out with and the question that you asked about Northern Contracting, Judge Rovner, with respect to the rules preclude a quota system. And, Judge Williams, you talked about numbers. You can argue about numbers all you want. Immediately prior to the January 15th letting, Secretary Hannig convened a December 23 meeting at which he instructed staff that there would be no waivers granted at the next letting. Yeah, but he had granted . . . In the past, he had. Yeah, but he was cracking . . . He granted more than 50 percent in 2009, and then when 2010 came, he granted more than 50 percent. After that. You can make all kinds of arguments about the numbers, pro and con. I have a different interpretation of those numbers. But you're not disputing that the numbers are accurate. I'm not disputing that the numbers are accurate, and I'm not disputing that the number of waivers substantially decreased in the face of a bigger program and a lot more goals. I also would submit to you that the undisputed facts are that there was no waiver granted at the . . . The January 15th letting was a big letting. That's the letting that we're focusing on. There were no waivers granted at that letting until after we filed our lawsuit. Secretary Hannig announced at the December 23 meeting that there would be no waivers. On January 8th, the EEO officer for District 8 who attended that meeting conducted a meeting of contractors and told those contractors, Secretary Hannig personally told me that there will be no waivers granted at the January 15th letting. That message was . . . His superior, the regional engineer, found out about that, and the testimony is simply that she told her superior. The superior was the director of highways, and the director of highways can't remember what she did. The reason that there's no . . . They did nothing. The normal person, if there was a no waiver . . . If there wasn't a no waiver policy in effect, would have called that individual on the carpet, would have directed messages out to the contractors to say that's not true. We talked about spanking your children. I submit to you that the list of things that you identified on Judge Rovner on page 20 of the brief are exactly that. Those were all designed to create an interim effect, and when you go back and you look at what IDOT did in its violation of the rules, you will realize that the message being sent to contractors was meet the goals. Actually, you better exceed them, because if you make a math error, we're going to bounce your bid. I also submit to you that this notion that there was confusion by the legal staff with respect to the new process is subterfuge. Look at the . . . They wrote a DBE special provision specifically to govern the new procedures. That DBE special provision was written by the department's legal staff. It required all of the provisions that we're complaining about on page 20 to be implemented. Before a bid was rejected, the special provision required that the good faith efforts be analyzed before the bid was rejected. That didn't happen. It required that if the bid was rejected for lack of good faith efforts, that the contractor be so notified. That didn't happen. The FHWA criticized them for it. How do you go to reconsideration without knowing what it is you're arguing about? So they go to reconsideration. Mr. Grunlow, the hearing officer, a political appointee, former state rep, who was in all the meetings where the no-waiver policy was discussed, sits quiet. After the reconsideration hearing, he doesn't issue anything in writing. That also violated the rules, and it violated the special provision that was put together for this letting. I suggest to you that there were conscious, intentional violations of the rules to keep the contractors in the dark and force them to meet the goals. Thank you. Thank you. I appreciate it. Okay. Case will be taken under advisement.